EMMETT GEORGE v. THE STATE.

No. 13161.  Delivered February 26, 1930.
Reported in 26 S. W. (2d) 249.

The opinion states the case.

*J. S. Bracewell* and *F. O. Fuller,* both of Houston, for appellant.

*A. A. Dawson* of Canton, State's Attorney, for the State.

CHRISTIAN, JUDGE.—The offense is robbery by assault; the punishment confinement in the penitentiary for five years.

Appellant and a companion entered a store in the city of Houston, held a pistol on the proprietor and took ten dollars from the cash register. No physical injury was inflicted upon any one in the store. Upon trial appellant was not represented by counsel. He entered a plea of guilty. Touching the transaction, he testified as follows: "I have been in Houston since the Sunday before the Sunday preceding the first robbery. I did not intend to shoot anybody. The boy that was with me was named Harry Waller. He is a year older than I am. I will be eighteen years old in September. I am taller than Harry Waller, but he is heavier than I am. I live in Atlanta, Georgia, and have been going to high school there. It is called the Tech high school. I will graduate next January. I am not a regular criminal. I have not been in trouble before. My father works for the City of Atlanta. He is connected with the electrical department. It is true that I helped rob the store at 506 Travis as Mr. Talley has testified. I plead guilty to that, as there is nothing else I can do. I am not trying to cry because I am sorry I got caught, but because I am sorry I did the robbery. We registered at the De George Hotel here in Houston under assumed names. I did that because I knew that we were doing wrong. I brought my pistol here from Atlanta, Georgia but I have never fired a pistol before. We came here in a driverless system auto."

The arrest occurred on June 24, 1929 at about 10 a. m. Before noon of the same day an indictment was returned charging appellant with the offense of robbery by assault. On the same day the case was set for trial on June 27, 1929. Appellant was without funds, and was unable to communicate with his people in Atlanta, Georgia. He was unacquainted in Houston, except that he had met one L. J. Jones. Jones sent a telegram to Atlanta to appellant's father, advising him of the charge against appellant. The father wired Jones to advise his son to tell the truth and ask for mercy. Upon further reflection, he decided to go to Houston and aid his

son. He telegraphed Jones to tell his son to have the case postponed. The message was communicated to the district attorney prior to the beginning of the trial. He promised to disclose the matter to the court. He failed to communicate the matter to the court because of the fact that when he entered the court room the trial was already under way. Hence there was no motion for postponement.

On his motion for new trial appellant was represented by counsel who had been employed by his father. Several grounds were asserted as a basis for a new trial, among them being that appellant was not allowed sufficient time to prepare for trial, and that he was insane at the time of the commission of the offense. Attached to the motion were testimonials of good character given by citizens, school teachers and officials of the city of Atlanta, Georgia. Also attached thereto was the affidavit of appellant's father to the effect that he believed appellant was insane at the time of the commission of the offense. The affidavits of two physicians of Houston, who examined appellant after his conviction, were to the effect that in their opinion appellant was not in a position at the time of the commission of the offense "to distinguish clearly between right and wrong as a normal individual would or to exercise the usual inhibitions against temptation which the average individual possesses." The court heard evidence on the motion for a new trial. Appellant's father testified that appellant had received an injury in a prize-fight, which resulted in great suffering and nervousness on appellant's part; that prior to his injury he had conducted himself properly; that he noticed a change in appellant after he had received the injury; that he left home without his consent; that he had never given him any trouble before, always conducting himself properly; that in his opinion appellant had been of unsound mind since receiving the injury; that appellant's grandfather had died insane. On cross-examination, the witness said: "He ought to know the difference between right and wrong and stealing and holding up and robbing anybody—sure he does." One of appellant's attorneys testified: "If you want my opinion, judging from what I have seen of him, there is something wrong with the boy. At times he talks intelligently and at other times he doesn't talk coherently; he has some mental derangement; what it is I do not know." On examination by the state, the two physicians who had examined appellant at the instance of appellant's attorneys testified that in their opinion he knew the difference between right and wrong. Further testifying one of the physicians

said: "I would say that a boy who has never been away from home but once before in his life, and then with his parents' consent, and then leaving without his parents' knowledge, away for over three weeks in a different state, stranded, without funds or acquaintances, that such conditions would bring about in the defendant the condition I have spoken of, and under all the facts stated here as preceding the event, I would say that defendant was in an abnormal state of mentality at that time. My experience is that wholly insane persons do know the difference between right and wrong, but may not have the control to act accordingly—but they know it." This witness further testified that appellant's injury and probable subnormal condition could have produced in him a condition in which he would not know right from wrong. However, the witness said he did not know whether such condition had been in fact produced. Two other physicians testified that in their opinion appellant was sane. Other witnesses expressed the same opinion.

The testimony in its entirety, if put before the jury, would have presented the issue of insanity at the time of the commission of the offense and at the time of the trial. Appellant was not represented by counsel on his trial. He was far removed from home and friends. He was without funds and unable to secure aid. He was put to his trial within three days after his arrest. His father did not have time to come to his assistance. He was a mere youth, under eighteen years of age, in a strange land, among strangers, without witnesses and without counsel. He had no opportunity to present the defense of insanity. Touching the question of newly discovered evidence on the issue of insanity, we quote from Schuessler vs. State, 19 Tex. Cr. Apps. 479 as follows:

"It is true that no diligence had been used by the defendant to discover and produce this testimony. On the contrary, his desire was that such testimony should not be resorted to. If, in fact, the defendant is insane, it could not be expected that he would use diligence to obtain the testimony, and the law would not exact it of him. His counsel appear to have used reasonable diligence to obtain testimony, and did obtain some as to his mental condition, and show good reason why they did not produce the testimony which they show can be produced on another trial. This newly-discovered evidence is certainly material, and calculated, we think, to change the result on another trial."

See also Horhouse vs. State, 50 S. W. 361; Hill vs. State, 53 S. W. 845; Walker vs. State, 216 S. W. 1085; Rowden vs. State, 18 S. W. (2d) 170.

Giving effect to the rule announced in the decisions referred to, we are of the opinion that the evidence of the witnesses touching the question of insanity should be placed before the jury.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.